T.C. Memo. 1997-85


UNITED STATES TAX COURT

SALAHEDDIN AHMAD AHMAD, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18260-94.              Filed February 19, 1997.


<u>Janice Burns King</u>, for petitioner.

<u>Lawrence B. Austin</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Prior to issuing a notice of deficiency,
respondent made a jeopardy assessment against petitioner for
1991, 1992, and 1993, as follows:

| Year | Additions to Tax Sec. 6651(a)(1) | Sec. 6654 |
|------|------|------|
| 1991 | $1,489 | $342 |
| 1992 | 6,114 | 1,068 |
| 1993 | 2,842 | 1,191 |

Within 60 days of making the jeopardy assessment, respondent determined deficiencies in, and additions to, petitioner's Federal income tax for 1991, 1992, and 1993 as follows:

|  |  | Additions to Tax | |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6654 |
| 1991 | $5,957 | $1,489 | $344 |
| 1992 | 24,457 | 6,114 | 1,069 |
| 1993 | 28,416 | 7,104 | 1,191 |

The issues for decision are: (1) Whether respondent's notice of deficiency was arbitrary. We hold it was not. (2) Whether petitioner has unreported income for the tax years 1991, 1992, and 1993. We hold he does, to the extent set out below. (3) Whether petitioner is liable for self-employment tax for 1991, 1992, and 1993. We hold he is. (4) Whether petitioner is liable for an addition to tax under section 6651(a)(1)[1] for 1991, 1992, and 1993 for failure to file Federal income tax returns. We hold he is, to the extent set out below. (5) Whether petitioner is liable for an addition to tax under section 6654 for 1991, 1992, and 1993 for the failure to make estimated tax payments. We hold he is, to the extent set out below.

---

[1]  All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.  All dollar amounts are rounded to the nearest dollar, unless otherwise indicated.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated into our findings by this reference. At the time the petition in this case was filed, petitioner resided in Calhoun, Georgia (Calhoun).

I.  General Background--Petitioner

In 1984, petitioner came to the United States from the Kingdom of Jordan on a student visa to attend college. At the time petitioner came to this country, his brother, Mr. Saleh Rashid (Saleh),[2] was already attending college at Kennesaw State College, later transferring to a different university. On April 1, 1989, petitioner received a bachelor of science degree in Computer Science from Kennesaw State College.

During 1991, 1992, and 1993, petitioner held checking account No. 21-227-133 (checking account) and savings accounts Nos. 05-258-873 (savings account #1), 21-227-144 (savings account #2), 05-866-293 (savings account #3), and 05-866-304 (savings account #4), with Wachovia Bank (Wachovia), 315 South Wall

---

[2]    In response to a query by the Court, petitioner explained that four of his brothers have a surname that is different from Ahmad, the one he shares with his parents, as a result of a clerk's error in updating the Jordanian civil registration system 15 years ago. Petitioner testified that the family's correct surname is Rashid. Petitioner noted however, that because "it takes so much effort to go back and correct everything, * * * we said, It is not a big deal. And that is why we have, you know, two different last names."

Street, Calhoun, Georgia.  Petitioner made deposits in his checking and savings accounts totaling $24,300 in 1991, $90,120 in 1992, and $126,141 in 1993.

Petitioner married Tonia Judd (Tonia) in April 1991, and they were divorced on December 5, 1991.[3]  During the divorce proceedings, petitioner withdrew $11,000 from his bank accounts, including the proceeds of three certificates of deposit.[4]  He transferred $6,000 to a cousin and $5,000 to a friend, because of his fear that his wife "might get some of the money."  Later that year, after the divorce papers were signed, the transferees returned the money, plus interest, by check, and petitioner redeposited the funds in his checking account.

Petitioner became a resident alien in 1991.  Prior to that time, petitioner's immigration status did not permit him employment.  The terms of the visa notwithstanding, petitioner

---

[3]  The stipulated date of the divorce is Dec. 5, 1990; however, the date on the divorce decree entered into evidence is Dec. 5, 1991.  While stipulations are not set aside lightly, we have broad discretion in determining whether to hold a party to a stipulation. Blohm v. Commissioner, 994 F.2d 1542, 1553 (11th Cir. 1993), affg. T.C. Memo. 1991-636.  The evidence in the record demonstrates the stipulated date is simply incorrect.  We are not bound by stipulations of fact that appear contrary to the facts disclosed by the record. Rule 91(e); Blohm v. Commissioner, supra (citing Mead's Bakery, Inc. v. Commissioner, 364 F.2d 101, 106 (5th Cir. 1966), revg. T.C. Memo. 1964-104).  We, therefore, find as fact that the date of petitioner's divorce is Dec. 5, 1991.

[4]  On Mar. 11, 1991, three 6-month certificates of deposit that petitioner owned in the total amount of $4,000 matured, and petitioner received $146 of interest.

worked in several restaurants during 1991, quitting whenever his employers pressed him for Social Security information. Petitioner earned income from these jobs but does not remember the amounts. Petitioner did not file an income tax return for 1991, because he was concerned about the consequences of working in contravention of the immigration law. Despite his efforts to avoid providing required information to his employers, petitioner did receive one Form W-2 (Wage and Tax Statement) reporting wage income of $585 for 1991.

During the years in issue, petitioner's brother, Saleh, owned a restaurant. During 1992, petitioner worked at Saleh's restaurant by covering for employees who would fail to come in. He also took Saleh's wife to the market and their children to the doctor. In exchange for his help, Saleh gave petitioner "some spending money." Petitioner did not report this income on a Federal income tax return for 1992. At the time of trial, Saleh resided in Calhoun and owned a restaurant, the Atlanta Gate.

In September of 1992, petitioner began to cohabit with Samantha Gibson (Gibson). Gibson was married but separated from her husband and was employed as a waitress. In addition to wage and tip income, Gibson received support payments for her two children. At the time of trial, petitioner and Gibson were married and living together in Calhoun.

II.  Bank Deposits and Withdrawals

    A. 1991

    Petitioner deposited a total of $24,300 into his checking and savings accounts between June 13 and December 31, 1991.  Some of the deposits were combination deposits; that is, deposits of both cash and checks.  For example, on December 3, petitioner deposited $1,600 in cash in his checking account along with a $30 third-party check payable to Tonia.  For 1991, petitioner's checking account deposits totaled $18,400; petitioner made eight cash deposits, totaling $7,220, and three check deposits, totaling $11,180.[5]

    Petitioner made two deposits into savings account #1; he deposited a check for $5,000 on December 10, and he deposited $900 in cash on December 31.  The $5,000 check deposit was a transfer of funds by check from petitioner's checking account to the savings account.  Petitioner also received $1.95 interest on this savings account.

---

[5]    Petitioner deposited checks in combination with cash.  The stipulations regarding the cash deposits do not correspond to the record.  For example, the parties stipulated that on July 30 and Nov. 5, petitioner made cash deposits of $6,648 and $5,919, respectively.  The evidence entered into the record, however, shows that on July 30 petitioner deposited a single check for $6,031 and $617 in cash.  The Nov. 5 deposit was a single check for $5,119 and $800 in cash.  As previously discussed, we are not bound by stipulations of fact that appear contrary to facts disclosed by the record.  See supra note 3.  We, therefore, disregard the stipulations regarding these deposits and find they were made according to the evidence entered in the record.

B.  1992

Petitioner deposited a total of $90,120 in his checking and savings accounts in 1992.  Petitioner made 16 deposits into his checking account, totaling $14,210.  At least 12 of these deposits, totaling $11,350, were cash deposits.[6]

Petitioner made 24 deposits, totaling $62,310, into savings account #1.  All of the deposits, except one, were cash deposits.  The sole noncash deposit of $50 was a refund petitioner received from a dating service.  On July 2, petitioner deposited $15,000 into this account, which was the proceeds of a loan he received from Wachovia.  On August 28, he withdrew $14,748 to repay the balance remaining on this loan.

Between April 29 and November 4, petitioner made three deposits, totaling $10,000, into his savings account #3.  At least one deposit, of $2,000, was in cash.[7]  On the same dates that petitioner made deposits into savings account #3, he also made deposits into savings account #4.  The three deposits into

---

[6]    It is unclear from the record whether the deposits of $500, $700, $860, and $800, made on June 24, Sept. 1, Nov. 4, and Dec. 8, respectively, were cash deposits.  Due to the uncertain nature of these deposits, these amounts are not included as cash deposits.

[7]    Petitioner made deposits on Apr. 1, June 24, and Nov. 4. It is unclear from the record whether the deposits made on Apr. 29 and Nov. 4, each for $4,000, were deposits of cash.

savings account #4 totaled $3,600.  At least two of the deposits, in the amounts of $1,000 and $2,000, were deposits of cash.[8]

Petitioner received $23 interest on his checking account; $486 on savings account #1; $128 on savings account #3; and $77 on savings account #4.

Petitioner wire transferred $2,750 sometime between January 15 and February 12;[9] $1,000 on May 13; and $10,000 on November 13, 1992, from savings account #1 to his father, Ahmad Mohammed Rashid Ahmad, in Jordan.  On July 3, petitioner wire transferred $15,000 from savings account #1 to Omaha, Nebraska.

C.  1993

Petitioner deposited a total of $126,141 in his checking and savings accounts in 1993.  Petitioner made 20 deposits, totaling $75,478, in his checking account.[10]  At least 17 of the deposits, totaling $29,881, were deposits of cash.[11]  Some of the deposits were combination deposits.  For example, on June 30, petitioner

---

[8]  It is unclear from the record whether the deposit on Apr. 29 was a deposit of cash.

[9]  We cannot determine the exact date of the $2,750 wire transfer because the copy of petitioner's bank statement entered in evidence is practically illegible in this detail.  It is clear from the statement, however, that the bank statement was for the period of Jan. 15 to Feb. 12, 1992, the wire transfer was to Ahmad Mohammed Rashid Ahmad, and the amount transferred was $2,750.

[10]  The parties stipulated that a $40,544 deposit made on Nov. 16 was the transfer of the closing balance of savings account #1.

[11]  The record is unclear whether the deposit on Dec. 21 of $1,250 was a cash deposit.

withdrew $1,988 from his checking account, and a week later he deposited a third-party check payable to Gibson in the same amount, along with $1,030 in cash.[12]

Between January 6 and November 3, petitioner made 19 deposits, totaling $41,613, in savings account #1. At least 13 of the deposits, totaling $35,024, were deposits of cash.[13] Two of the deposits were combination deposits.[14] Petitioner made one deposit each to savings accounts #3 and #4. On April 15, petitioner deposited $6,000 in cash into savings account #3, and on April 14, he deposited $3,050 in cash into savings account #4.

Petitioner received $150 of interest on his checking account; $600 on savings account #1; $162 on savings account #3; and $87 on savings account #4.

Petitioner closed savings accounts #3 and #4 on July 12, 1993, by withdrawing the balances, $16,302 and $8,623, respectively. Petitioner closed savings account #1 on November 16, 1993, by withdrawing the balance of $40,544 and depositing it into his checking account.

---

[12]    Six of the deposits were combination deposits.

[13]    It is unclear from the record whether the deposits made on Jan. 28, Mar. 10, Sept. 8, Oct. 5, Oct. 12, and Nov. 3, in the respective amounts of $854, $1000, $900, $800, $800, and $1,600, were deposits of cash.

[14]    The deposit on May 25 for the total amount of $6,115 was a deposit of $6,000 cash and a check for $115. The deposit on Aug. 24 for the total amount of $3,320 was a deposit of $3,300 cash and a check for $20.

Petitioner transferred $2,200 by wire from savings account #1 on September 15, to his father in Jordan. On November 30, he transferred $15,000, and on December 28, $16,000, from his checking account to an account in his name at the Cairo Bank in Amman, Jordan.

Between April 16 and December 28, 1993, petitioner's bank, Wachovia, filed nine Currency Transaction Reports (Form 4789) detailing his cash transactions. In the identification section of the form, Wachovia reported petitioner's occupation as "Cook at Local Restaurant".

## OPINION

## Issue 1. Whether Respondent's Notice of Deficiency Was Arbitrary

Respondent determined that petitioner has a deficiency of $5,957 for 1991, $24,457 for 1992, and $28,416 for 1993. These deficiencies are based on income in the amounts of $24,592, $74,634, and $86,464 for 1991, 1992, and 1993, respectively. Petitioner asserts that because the Commissioner did not produce evidence linking him to an income-producing activity, the Commissioner was arbitrary and erroneous in her determination so that she bears the burden of proof. Petitioner cites Portillo v. Commissioner, 932 F.2d 1128 (5th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1990-68, and Senter v. Commissioner, T.C. Memo. 1995-311, in support of his position. As discussed below, petitioner's reliance on these cases is misplaced. We

sustain respondent's determinations for the taxable years at issue, except as set out below.

The first issue to be decided is who bears the burden of proof in this case. A statutory notice of deficiency ordinarily carries with it a presumption of correctness. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Due to this presumption, taxpayers generally have both the burden of proof and the burden of going forward with evidence. Dellacroce v. Commissioner, 83 T.C. 269, 280 (1984). However, if the taxpayer shows that the statutory notice is arbitrary or without foundation, the burden of going forward with the evidence shifts to the Commissioner. Id.

In asking this Court to find that the notice of deficiency is arbitrary, petitioner is asking us to explore the underpinnings of that notice. As a general rule, we will not look behind the statutory notice to examine the evidence used in making the determination. Petzoldt v. Commissioner, 92 T.C. 661, 688 (1989); Llorente v. Commissioner, 74 T.C. 260, 264 (1980), affd. in part and revd. and remanded in part 649 F.2d 152 (2d Cir. 1981); Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974). The rare exception to this rule is where the Commissioner, in a case involving unreported income, introduces no direct evidence but rests on the presumption of correctness and the taxpayer challenges the deficiency on the grounds that it is arbitrary. Portillo v. Commissioner, supra at 1133; Schad v.

<u>Commissioner</u>, 87 T.C. 609, 618 (1986), affd. without published opinion 827 F.2d 774 (11th Cir. 1987); <u>Llorente v. Commissioner</u>, <u>supra</u> at 264.

In <u>Portillo v. Commissioner</u>, <u>supra</u>, the taxpayer was a painting contractor who received a Form 1099 (Miscellaneous Income) that he claimed was not correct. Other than the uncorroborated testimony of a witness who testified that he had paid the taxpayer the disputed amount of income, there was no evidence supporting the Commissioner's determination. The Court of Appeals for the Fifth Circuit noted that, like this Court, it is reluctant to look at the facts underlying the Commissioner's notice of deficiency. The Court of Appeals also held, however, that it will "not give effect to the presumption of correctness in a case involving unreported income if the Commissioner cannot present some predicate evidence supporting its determination." <u>Id.</u> at 1133. More specifically, the Court of Appeals articulated its rule as follows:

> before we will give the Commissioner the benefit of the presumption of correctness, he must engage in one final foray for truth in order to provide the court with some indicia that the taxpayer received unreported income. The Commissioner would merely need to attempt to substantiate the charge of unreported income by some other means, such as by showing the taxpayer's <u>net worth, bank deposits, cash expenditures, or source and application of funds</u>. * * * [<u>Id.</u> at 1133-1134; emphasis added.]

In <u>Senter v. Commissioner</u>, <u>supra</u>, the Commissioner based her determination solely on the assertion that the taxpayer filed no returns for 1987 through 1991. The Commissioner reconstructed

the taxpayer's income for those years based on income he reported in 1984, increased by the consumer price index. There was no evidence presented by either party regarding whether the taxpayer had taxable income during the years in issue. Because the Commissioner produced no predicate evidence supporting the determination, we found respondent's determination arbitrary and erroneous. Moreover, citing Portillo v. Commissioner, supra at 1133, we concluded that the rule in the Court of Appeals for the Fifth Circuit, to which any appeal of Senter would lie, is that once the presumption of correctness disappears, the Commissioner bears the burden of proof.

We think the facts of the instant case are distinguishable from those of Portillo v. Commissioner, supra, and Senter v. Commissioner, supra. In both of those cases, the Commissioner did not present predicate evidence in support of the determination that the taxpayer had unreported income. In the present case, however, the respondent substantiated the charge with predicate evidence; she used the bank deposits and cash expenditures method of income reconstruction. Portillo v. Commissioner, supra at 1133-1134. Thus, respondent's deficiency determination was not arbitrary. See also Blohm v. Commissioner, 994 F.2d 1542, 1549 (11th Cir. 1993), affg. T.C. Memo. 1991-636 (once the Tax Court has found the Commissioner has made a minimal evidentiary showing, the deficiency determination is presumed correct); Erickson v. Commissioner, 937 F.2d 1548, 1551 (10th

Cir. 1991), affg. T.C. Memo. 1989-552 (the key is connecting taxpayers to assets, not to a business).

Since respondent's deficiency notice was not arbitrary, petitioner has the burden of going forward with the evidence as well as the ultimate burden of persuasion. See Dellacroce v. Commissioner, supra at 280.

Issue 2.  Unreported Income for 1991, 1992, and 1993

Utilizing the bank deposits and cash expenditures method of income reconstruction, respondent determined petitioner had income in the amounts of $24,592, $74,634, and $86,464 for 1991, 1992, and 1993, respectively.

Every taxpayer is required to maintain adequate records of taxable income. Sec. 6001. Petitioner did not file a Federal income tax return or make any estimated Federal income tax payments for any of the years in issue. Nor did he maintain adequate records from which the amount of his income or Federal income tax liability for any of the years in issue could be computed. In the absence of such records, the Commissioner may reconstruct the taxpayer's income by any method that, in her opinion, clearly reflects income. Sec. 446(b); Parks v. Commissioner, 94 T.C. 654, 658 (1990). The Commissioner's method need not be exact but must be reasonable. Holland v. United States, 348 U.S. 121 (1954).

The bank deposits method for computing unreported income has long been sanctioned by the courts. DiLeo v. Commissioner, 96

T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  Though
not conclusive, bank deposits are prima facie evidence of income.
Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964) (the
bank deposits method assumes that all money deposited in a
taxpayer's bank account during a given period constitutes taxable
income);[15] Tokarski v. Commissioner, 87 T.C. 74, 77 (1986);
Estate of Mason v. Commissioner, 64 T.C. 651, 656-657 (1975),
affd. 566 F.2d 2 (6th Cir. 1977); Jones v. Commissioner, 29 T.C.
601 (1957).  Where the taxpayer has failed to maintain adequate
records as to the amount and source of his income, and the
Commissioner has determined that the deposits are income, the
taxpayer has the burden of showing that the determination is
incorrect.  Rule 142(a); Clayton v. Commissioner, 102 T.C. 632,
645 (1994); Parks v. Commissioner, supra; Estate of Mason v.
Commissioner, supra.  Furthermore, in such cases the Commissioner
is not required to show a likely source of income.  Clayton v.
Commissioner, supra; Parks v. Commissioner, supra; Estate of
Mason v. Commissioner, supra.

In challenging respondent's income reconstruction,
petitioner introduced evidence that was intended to corroborate
his claim that the deposits were due to nontaxable sources.  This

---

[15]    In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th
Cir. 1981) (en banc), the Court of Appeals for the Eleventh
Circuit adopted as binding precedent all of the decisions of the
former Court of Appeals for the Fifth Circuit handed down prior
to the close of business on Sept. 30, 1981.

evidence primarily consists of his testimony, selected checking and savings account statements, five canceled checks, and three written statements by his friends.  The written statements constitute ex parte affidavits and are not treated as evidence under Rule 143(b).  Upon review of the evidence presented, we are not persuaded that the source of the deposits was from nontaxable income items, except to the extent as follows.

A.  1991

For 1991, petitioner deposited a total of $24,300 in his checking and savings accounts.  Except for the following amounts, we find the deposits are income to petitioner that is subject to tax pursuant to section 61(a).  Based on the entire record, we are persuaded that the deposits of the checks for $5,119 and $6,031 are the return of funds, plus interest, that petitioner transferred to associates with the intent to prevent his first wife, Tonia, receiving any money in settlement of divorce.[16]  In addition, we find the check for $30 payable to Tonia that petitioner cashed for her by depositing it in his account is not taxable income to him.  Petitioner's testimony regarding the source of these amounts is corroborated by the canceled checks which correlate with petitioner's bank statements.  Finally, the parties stipulated that the $5,000 deposit in savings account #1

---

[16]   We find that petitioner has interest income to the extent the total amount of these two deposits exceeds $11,000.  See sec. 61(a)(4).

on December 10 was a transfer of petitioner's funds from his checking account.  This amount is a redeposit; therefore, it is not gross income.

   B.  1992

   Petitioner deposited a total of $90,120 in his checking and savings accounts in 1992.  Except for the two following amounts, we find the deposits are income to petitioner that is subject to tax pursuant to section 61(a).  The parties stipulated the $15,000 deposit made on July 2 was the deposit of loan proceeds that petitioner received from Wachovia.  It is well established that gross income does not include loans.  James v. United States, 366 U.S. 213, 219 (1961); United States v. Rochelle, 384 F.2d 748, 751 (5th Cir. 1967).[17]  Petitioner submitted a bank copy of the dating service's canceled $50 refund check.  Thus, petitioner provided evidence that corroborates his testimony regarding the source of the sole noncash deposit for 1992 into this savings account.  The $50 deposit is the return of a personal expenditure for which petitioner received no tax benefit and is, therefore, not taxable income.

   C.  1993

   Petitioner deposited a total of $126,141 in his checking and savings accounts in 1993.  Except for the following amounts, we find the deposits are income to petitioner that is subject to

---

[17]    See supra note 15.

tax. The parties stipulated that the deposit of $40,544 into petitioner's checking account was a transfer of the balance of savings account #1. This amount is a redeposit; therefore, it is not gross income. Based on the entire record, we find petitioner has met his burden of proving the check for $1,988 payable to Gibson, which petitioner cashed for her by depositing in his account, is not taxable income to him.

Our finding that petitioner has met the burden of proof as to the source of these deposits is not a grant of credence to petitioner's claims regarding the source of his other deposits. Nor does the evidence presented by petitioner, which showed that some of the deposits were not income, establish that the use of the bank deposits method was invalid or arbitrary. Estate of Mason v. Commissioner, 64 T.C. at 656. Having reached that conclusion, we will comment in more detail on petitioner's evidence.

Petitioner testified that the sources of his other deposits were family transfers, repayments of loans he earlier made to friends and associates, and cash reimbursements for checks he wrote to pay the bills of others. Petitioner provided scant evidence to corroborate his claims. For example, to substantiate his claim that family members transferred money to him, petitioner submitted a copy of a wire transfer that originated in Jordan and was sent to Saleh in Calhoun. The wire transfer is for $15,000 and is dated April 12, 1990. We find, however, that

this wire transfer does not support petitioner's testimony because the transfer was sent to Saleh, not to petitioner. Accordingly, without evidence corroborating petitioner's claim that Saleh transferred the funds he received to petitioner, the copy of this wire transfer does not show that petitioner received any funds from his family.

Petitioner also introduced his check register into evidence to corroborate his claim that he made many loans to friends. Petitioner's reliance on his check register settles on a single entry that verifies he issued a check on December 8, 1991, for $1,000 to "Guss". This single entry is woefully inadequate to perform the task petitioner would assign it. The entry does not indicate the purpose of the amount paid, the intent of the parties, or any of the other indicia necessary to substantiate the existence of a loan.[18] We find this entry in petitioner's check register does not provide documentary evidence to establish the existence of the claimed loans.

Petitioner's claim that he paid the bills of others by check and received cash reimbursements which he deposited suffers from

---

[18] Factors which have been considered by courts as relevant in deciding whether a bona fide loan exists include among others: (1) The existence or nonexistence of a debt instrument; (2) provisions for security, interest payments, and a fixed repayment date; (3) whether or not repayments of the loan were made; (4) the taxpayer's ability to repay the loan; (5) the borrower's receipt of compensation; and (6) the testimony of the taxpayer. Frierdich v. Commissioner, T.C. Memo. 1989-393, affd. 925 F.2d 180 (7th Cir. 1991).

similar deficiencies.  For example, petitioner testified that during 1992, he often paid Saleh's rent, utilities, and other expenses by check, and Saleh reimbursed him in cash.  This claim is allegedly supported by a single check petitioner wrote to Barnett Bank.[19]  Petitioner was unable to offer any evidence to corroborate his claim of the purpose of the check, nor was he able to produce evidence of a reimbursing cash deposit in the amount of the check.  We find, therefore, that this check does not corroborate petitioner's claims with respect to the funds that he claimed are cash reimbursements of checks he wrote on behalf of others.

Petitioner relies on only his testimony to carry the burden of proving the source of the balance of his deposits.[20]  Thus, the issue is one of credibility wherein we must determine the extent to which the proffered testimony is believable.  See Schad v. Commissioner, 87 T.C. at 620.  It is well established that we are not required to accept self-serving testimony in the absence of corroborating evidence.  Niedringhaus v. Commissioner, 99 T.C.

---

[19]  A check drawn on petitioner's checking account in the amount of $2,328, made payable to Barnett Bank of Atlanta, was entered into evidence.  Petitioner asserts this check was issued to pay the balance due on Saleh's automobile.

[20]  For example, petitioner testified he paid Gibson's personal bills, as well as her share of the household expenses, by check, and she reimbursed him in cash.  Petitioner estimated Gibson gave him $300 in cash each week for 17 weeks in 1992 and for 52 weeks in 1993, all of which he deposited in his accounts. This testimony is uncorroborated by any evidence.

202, 212 (1992); Tokarski v. Commissioner, 87 T.C. at 77. Petitioner failed to produce any corroborating evidence to support his testimony. Although petitioner testified that his wife, mother, and father, all of whom live in the same apartment with petitioner, and Saleh, who also lives in Calhoun, are the sources for his deposits, petitioner failed to call any family members to testify in an effort to verify his stories.[21] We cannot assume the testimony of absent witnesses would have been favorable to petitioner. Rather, the normal inference is that it would have been unfavorable. Tokarski v. Commissioner, supra at 77; Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Moreover, our analysis of petitioner's testimony reveals inconsistencies that cast doubt upon his credibility.[22]

---

[21] Petitioner's explanation for his failure to call any family members to testify is not credible. Petitioner explained that although he lives only 2 hours from the place of trial, he did not call his parents because the weather was "nasty", his parents do not speak English, and are "too old" (at 63 or 64 years of age) for him to put them through the ordeal of testifying via an interpreter. Considering his parents traveled from Jordan to Georgia only 2 weeks before the trial, successfully navigating similar hazards of greater scale than they would have encountered on a 2-hour journey from Calhoun to Atlanta, we find petitioner's explanation to be both inventive and implausible. Petitioner's explanation of why Gibson and Saleh could not attend the trial and contribute corroborating testimony shares an equally unreliable quality.

[22] For example, petitioner testified that his parents are very wealthy, at one time having enough money to "buy half of the
(continued...)

Thus, there is no credible evidence that the deposits were from nontaxable sources.  Based on the entire record, we simply do not believe that the money came from the sources petitioner claims. We find, therefore, that petitioner has not met his burden of proof with respect to the funds that he claims are family transfers, cash repayments of loans he made earlier, or reimbursements for checks he wrote on behalf of others.

Issue 3. Self-Employment Tax

Respondent determined that petitioner had income in the amounts of $24,592, $74,634, and $86,464 for 1991, 1992, and 1993, respectively, and that he is liable for self-employment tax of $3,351, $8,862, and $9,435 for those years.

Section 1401 imposes a tax on self-employment income.  Self-employment income consists of gross income from any trade or business carried on by an individual less allowable deductions attributable to the trade or business.  Sec. 1402(a). Respondent's determination that petitioner is liable for self-

---

[22](...continued)
capital of Amman"; however, because his father was frequently in need of cash, petitioner had to wire him transfers of what were often relatively modest amounts.  In addition, petitioner testified that many people owe him money, and that he carries the balance of the loans in his head, yet he can only approximate the amounts he has been repaid.  Finally, petitioner testified that he did not believe he owed taxes in 1991, 1992, and 1993 because the terms of his immigration prevented his steady employment. Petitioner testified that he actually did work in 1991, his legal status notwithstanding.  Petitioner also testified he became a resident alien during 1991.  Thus, petitioner's immigration status was not a legal obstacle to his employment during the latter part of and forever after 1991.

employment tax is presumed to be correct, and petitioner bears the burden of proving that it is erroneous. Rule 142(a); <u>Kasey v. Commissioner</u>, 33 T.C. 656, 660 (1960).

At trial, petitioner testified that during 1991 and 1992 he worked at several restaurants. Petitioner also testified, however, that he made very little money working at these restaurants, and the only Form W-2 petitioner received reported a mere $585 of wage income, which gives credence to his claim. We are persuaded that petitioner did not earn the unreported income determined by respondent, except for the amount reported on the Form W-2, as an employee.

Although petitioner has persuaded this Court that the source of his unreported income was not wages, he has not met his burden of proving that he did not receive such amounts from self-employment. Thus, we find petitioner is liable for self-employment tax on the unreported income as determined by respondent for 1991, 1992, and 1993, except for the $585 of wage income reported on the Form W-2 and the amounts that we have found hereinbefore are not income.

<u>Issue 4. Additions to Tax Under Section 6651(a)(1)</u>

Respondent determined petitioner is liable for additions to tax for failure to file income tax returns for 1991, 1992, and 1993 under section 6651.

Section 6651(a)(1) imposes an addition to tax for failure to file a return on the date prescribed (determined with regard to

any extension of time for filing), unless it is shown that such failure is due to a reasonable cause and not due to willful neglect. Sec. 6651(a)(1). The taxpayer has the burden of proving the addition is improper. Rule 142(a); United States v. Boyle, 469 U.S. 241, 245 (1985).

Petitioner did not file income tax returns for the years in issue. There is no evidence in the record that suggests petitioner's failure to file a Federal income tax return for any year in issue was due to reasonable cause and not due to willful neglect. Accordingly, we sustain respondent's determination with respect to this issue.

Issue 5. Additions to Tax Under Section 6654

Respondent determined that petitioner is liable for the addition to tax under section 6654(a) for his failure to make estimated tax payments for 1991, 1992, and 1993.

Subject to exceptions provided by the statute, the imposition of the addition to tax is otherwise automatic if the amounts of the withholdings and estimated tax payments do not equal statutorily designated amounts. Niedringhaus v. Commissioner, supra at 222; Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980). Petitioner bears the burden of showing that respondent's determination that section 6654 applies to all 3 taxable years is in error. Rule 142(a); Niedringhaus v. Commissioner, supra. Petitioner has made no such showing. For the years in issue petitioner had substantial taxable income, yet

he made no estimated tax payments.  Therefore, we hold he is liable for the additions to tax under section 6654(a) for those years.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.